# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**AURELIO REALIVASQUEZ,**

      Plaintiff,

    vs.                                  **CIV. NO.  03-0015 MCA/KBM**

**THE CITY OF ALBUQUERQUE,**
a body corporate,
**MATTHEW THOMPSON**,
in his official and individual capacities,
**MICHAEL ARCHIBEQUE**,
in his official and individual capacities,
and **PATRICK K. APODACA**,
in his official and individual capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on ***Defendants Thompson, Archibeque, and Apodaca's Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint*** [Doc. No. 32] filed on October 17, 2003, and the ***City Defendant's Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint Against It*** [Doc. No. 30] filed on October 17, 2003.  Having reviewed the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court grants the motions in part and denies the motions in part for the reasons set forth below.

## I.   **BACKGROUND**

On December 2, 2002, Plaintiff Aurelio Realivasquez filed a *Complaint for Assault, Battery, and Deprivation of Civil Rights* against Defendants Matthew Thompson, Michael Archibeque, Patrick K. Apodaca, and the City of Albuquerque in the Second Judicial District Court of Bernalillo County, New Mexico.   Plaintiff's *Complaint* asserts claims for deprivation of civil rights under 42 U.S.C. § 1983, as well as tort claims under state law for assault, battery, and negligent supervision and training.   All of these claims arise from an incident in which Plaintiff's arm was broken during an altercation with Defendants Thompson, Archibeque, and Apodaca on December 3, 2000.

Defendants removed this action to the United States District Court on January 6, 2003, and the parties have stipulated to this Court's jurisdiction in the *Initial Pretrial Report* [Doc. No. 10].   On October 17, 2003, Defendants Thompson, Archibeque, and Apodaca filed a motion for summary judgment asserting that they are entitled to qualified immunity with respect to Plaintiff's federal civil-rights claims and that Plaintiff's tort claims under state law are not viable because they acted lawfully and in good faith.   On that same date, Defendant City of Albuquerque filed an additional motion requesting summary judgment on Plaintiff's federal civil-rights claims for municipal liability and supervisory liability as well as his tort claims for negligent supervision and training under state law.

The evidence of record that is relevant to Defendants' motions can be summarized as follows.   At about 6:15 p.m. on December 3, 2000, or shortly thereafter, Plaintiff was traveling eastbound on Mountain Road in his pickup truck.   Meanwhile, Defendants

Thompson and Archibeque, acting in their capacity as uniformed Albuquerque police officers, had detained another unrelated vehicle in a traffic stop near the intersection of Mountain Road and Rio Grande Boulevard.  As Plaintiff approached the intersection where the traffic stop of the other vehicle was occurring, he stopped his pickup truck, put it in reverse, and backed into the vehicle behind him, causing minor property damage. (Realivasquez Aff. ¶¶ 3, 4; Realivasquez Dep. at 15; Ex. D, E to Defts.' Mem.)

The occupants of the vehicle with which Plaintiff's truck had collided contacted Defendants Thompson and Archibeque at the site of the traffic stop shortly after the collision occurred.  They described to the officers the manner in which their vehicle had been struck by Plaintiff's truck and told the officers that Plaintiff had driven off in his truck immediately after the collision occurred.  (Thompson Dep. at 6-7; Archibeque Dep. at 6; Thompson Aff. ¶¶ 5-6; Archibeque Aff. ¶¶ 5-10.)

Defendant Thompson located Plaintiff's pickup truck as it was leaving the intersection of Mountain Road and Rio Grande Boulevard and instructed Defendant Archibeque to stop it for the purpose of investigating the hit-and-run accident that was just reported to him. Defendant Archibeque pursued Plaintiff's truck in his marked police vehicle.  Anticipating that Plaintiff's truck would immediately pull over in response to Defendant Archibeque's actions, Defendant Thompson, along with the occupants of the vehicle with which Plaintiff's truck had collided, joined the pursuit shortly thereafter.  Defendant Thompson also advised his area supervisor, Defendant Apodaca, of the situation over his police radio.  (Thompson Dep. at 7-8, 19; Archibeque Dep. at 6-7; Thompson Aff. ¶¶ 7-9; Archibeque Aff. ¶¶ 11-12.)

Plaintiff's pickup truck turned southbound on Rio Grande Boulevard, and Defendant Archibeque caught up with it near the intersection of Rio Grande Boulevard and Central Avenue. Plaintiff's truck then turned westbound onto Central Avenue. Defendant Archibeque followed directly behind it and engaged his siren and red emergency lights to signal that Plaintiff should pull over. Defendant Thompson followed behind Defendant Archibeque and joined the pursuit, also activating the siren and red emergency lights on his marked police vehicle. In response to these actions, Plaintiff's pickup truck did not immediately pull over and instead kept driving westbound on Central Avenue. During this time, Defendant Thompson observed that Plaintiff's truck was traveling at less than forty miles per hour and was drifting slowly into the adjacent traffic lane. Plaintiff acknowledges that, at some point, he saw the emergency lights from one or more of the police vehicles. (Archibeque Dep. at 7-9; Thompson Dep. at 9-14; Realivasquez Aff. ¶ 6; Thompson Aff. ¶¶ 10-13; Archibeque Aff. ¶¶ 13-16.)

As Plaintiff's truck continued traveling westbound on Central, Defendant Thompson pulled up along the left side of it and issued verbal commands over a loudspeaker system directing the truck to stop. Plaintiff then made a right hand turn onto New York Street. Defendant Thompson described the turn as "sudden" and "evasive." He also noted that Plaintiff's truck overcorrected and almost struck the curb beside the sidewalk before straightening its path and continuing down New York Street. Plaintiff claims he was looking for a place to pull over during this period. His truck eventually slowed down and came to

a stop near the intersection of New York Street and Montoya Street.  (Thompson Dep. at 14-17; Thompson Aff. ¶ 14-20; Archibeque Aff. ¶ 17-19; Realivasquez Aff. ¶ 6.)

Both Defendant Thompson and Defendant Archibeque were present at the scene of the stop.  According to Defendant Thompson, Plaintiff exited his truck and looked back toward the police vehicles. Defendant Archibeque then approached Plaintiff with his gun drawn and issued commands in both English and Spanish directing Plaintiff to show his hands or lay down on the ground.  Defendant Archibeque observed that Plaintiff began walking away from him and was ignoring his commands.  Defendant Thompson interpreted this behavior to mean that Plaintiff was about to flee on foot.  (Thompson Dep. at 18-21; Archibeque Dep. at 14-17; Thompson Aff. ¶¶ 20-24; Archibeque Aff. ¶¶ 20-22.)

As Plaintiff allegedly began a hasty retreat from the officers, Defendant Archibeque caught up to him and grabbed him by his left arm in an attempt to take him down to the ground using an "arm-bar take down technique."  Defendant Archibeque claims that Plaintiff resisted this attempt and began to run away.   Defendants Archibeque and Thompson continued their pursuit and eventually succeeded in bringing Plaintiff to the ground using the arm-bar technique on his left arm.  Defendant Apodaca arrived at the scene and joined the altercation after Plaintiff was on the ground.  (Archibeque Aff. ¶ 22-25; Thompson Aff. ¶¶ 25-26 Apodaca Aff. ¶ 6-7.)

Defendants claim that Plaintiff continued his resistance after he was on the ground by pushing them away and telling them to get off of him.  Defendant Archibeque sprayed a short burst of pepper spray to Plaintiff's facial area, which appeared to have no effect as,

according to Defendants, Plaintiff continued to resist their efforts to place him on the ground and handcuff him.  Defendants also claim that they continued to give Plaintiff verbal commands in both English and Spanish, which he ignored.  According to Defendants, Plaintiff kept resisting by bringing his knees up to his chest and twisting his arms underneath his body in an effort to push his torso up and off the ground.  In response to this continued resistance, Defendant Archibeque attempted to gain control of Plaintiff's left arm while Defendant Thompson attempted to gain control of Plaintiff's right arm, and Defendant Apodaca placed his knee in the center of Plaintiff's back to keep him from rising from the ground.  Defendants claim that when they attempted to place Plaintiff's wrists together behind his back so they could handcuff him, Plaintiff tried to pull his right arm away from Defendant Thompson.  In response, Defendant Thompson claims that he utilized a "pain compliance technique" by pushing Plaintiff's right wrist and shoulder into the ground. (Thompson Dep. at 34-37, 46-51; Archibeque Dep. at 30-31; Thompson Aff. ¶¶ 27-31; Archibeque Aff. ¶¶ 26-31; Apodaca Aff. ¶¶ 8-9.)

While Defendant Thompson applied this technique and Plaintiff continued his struggle to get up and off the ground, Defendants claim they heard a snap or a pop, after which Plaintiff ceased his resistance and was handcuffed.  Defendants then realized that Plaintiff's arm had been injured.  They released him from the handcuffs and summoned medical assistance.  (Thompson Dep. at 51-53; Archibeque Dep. at 30; Thompson Aff. ¶¶ 31-32; Archibeque Aff. ¶ 32; Apodaca Aff. ¶ 10.)

Plaintiff tells a different story of what happened after he stopped his truck on New York Street.   According to Plaintiff, he saw a police officer pointing a gun at him immediately after he pulled over, and then the officer started to yell something.   Plaintiff claims that he could not understand the officers' commands because his windows were rolled up and his knowledge of the English language is limited.   Plaintiff further alleges that he exited his truck in response to the police officer's actions and was rushed to the ground by two police officers immediately thereafter.   Plaintiff claims that the two officers threw him to the ground, grabbed both of his arms while he was pinned to the ground, and sprayed mace at his face.   He claims that a third officer later joined the altercation, and that one or more of the officers pulled his right arm behind his back to inflict pain.   At this point, Plaintiff claims that he yelled repeatedly for the officers to stop and told them that they were going to break his arm if they continued.   According to Plaintiff, the officers did not stop inflicting pain on his right arm until they broke it, causing a loud snap.   After breaking his arm, Plaintiff claims that the officers handcuffed him to inflict additional pain. (Realivasquez Aff. ¶¶ 7-15.)

After Plaintiff's arm was broken, Defendant Thompson transported him to a hospital for medical treatment.   While at the hospital, Plaintiff was read his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and he consented to a blood test, which revealed that his blood-alcohol content was .10 gms/100 ml.   Prior to the blood test, Defendants Thompson and Apodaca had observed that Plaintiff appeared intoxicated:  his speech was slurred, his eyes were not tracking properly, and he smelled of alcohol.   Plaintiff admitted to Defendant

Thompson, and in his deposition, that he drank alcoholic beverages before the events described above began.  (Realivasquez Dep. at 15, 20; Realivasquez Aff. ¶ 16; Thompson Dep. at 53; Thompson Aff. ¶¶ 33-37; Apodaca Aff. ¶ 12; Ex. G to Defts.' Mem; Ex. C to Pl.'s Mem.)

After receiving medical treatment and a blood test at the hospital, Defendant Thompson transported Plaintiff to the Bernalillo County Detention Center, where he was booked on charges of leaving the scene of an accident, reckless driving, eluding police, resisting arrest, and driving while intoxicated.  Plaintiff later pled guilty to one count of careless driving and agreed to pay restitution for the minor property damage to the vehicle with which his truck collided.  All other criminal charges arising from the incident were dismissed.  (Realivasquez Aff. ¶¶ 17-19; Thompson Aff. ¶ 35; Ex. C to Pl.'s Mem; Ex. J, K, L to Defts.' Reply.)

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed. R. Civ. P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts

showing that there is a genuine issue for trial." Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671-72 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  See Medina v. Cram, 252 F.3d 1124, 1128-29 (10th Cir. 2001); Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  See Gross, 245 F.3d at 1156.  If the plaintiff does establish the violation

of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See id.

### B.   Plaintiff's Civil Rights Claims under 42 U.S.C. § 1983

#### 1.   Individual Liability and Qualified Immunity

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," particularly when an official's conduct amounts to "obvious cruelty." Hope

v. Pelzer, 536 U.S. 730, 741, 745 (2002); see, e.g., Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001) (denying qualified immunity to SWAT deputies "for training a firearm directly on a four-year-old child").  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, the analysis of Plaintiffs' federal civil-rights claims necessarily begins by identifying the specific federal rights which the individual Defendants are alleged to have violated.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Reno v. Flores, 507 U.S. 292, 302 (1993); Dixon v. City of Lawton, 898 F.2d 1443, 1448 (10th Cir. 1990).  Plaintiff's *Complaint* alleges violations of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, presumably invoking the constitutional prohibition against unreasonable searches and seizures as well as his constitutional right to substantive due process.

The alleged violations occurred while Plaintiff was in the process of being detained without a warrant and before he was brought before a judicial officer for a determination of probable cause.  Accordingly, Plaintiff's claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard."  Graham, 490 U.S. at 388; see Frohmader v. Wayne, 958 F.2d 1024, 1026 (10th Cir. 1992).  Plaintiff has stated no objections to this approach in response to Defendants' summary judgment motions, and thus any other federal civil-rights claims

besides those arising under the Fourth Amendment are deemed to have been abandoned.  See Adler, 144 F.3d at 671-72 (explaining non-movant's burden in responding to motion for summary judgment).

When, as here, a defense of qualified immunity is raised by individual Defendants in the context of the Fourth Amendment's "objective reasonableness" standard, the Court applies two distinct standards of reasonableness.  First, in determining whether an individual defendant's actions violated a specific right, the Court must decide whether the seizure, and the force used to effect that seizure, were "unreasonable" under the Fourth Amendment.  Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

The subjective intentions or state of mind of the Plaintiff or the individual Defendants are not relevant to determining whether a seizure or its execution is objectively reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Rather, "the reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  Medina, 252 F.3d at 1131 (quoting Graham, 490

U.S. at 396-97).  This assessment must be "based upon the information the officers had when the conduct occurred."  Saucier, 533 U.S. at 207.

### a.      Probable Cause to Arrest

For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has divided interactions between police and citizens into three categories:  consensual encounters, investigative stops, and arrests.  See Oliver, 209 F.3d at 1186.  A consensual encounter occurs when a police officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and end the encounter.  Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Id.

An investigative stop occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  Id. (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements in order to be considered "reasonable" under the Fourth Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations

on both the length of the detention and the manner in which it is carried out" in this context, United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'" Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  Inasmuch as an arrest in a public place exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause.  "'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" Id. (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  "[T]he standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'" Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).

The veracity of crime victims, or crime-scene bystanders, ordinarily is assumed in making determinations of reasonable suspicion and probable cause.  See United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc).  Nevertheless, police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  In this case, Defendants Thompson and Archibeque were entitled to rely on the veracity of the persons who reported the hit-and-run accident in deciding whether they had reason to stop Plaintiff.

-14-

The Court notes the following undisputed facts which support a reasonable suspicion to conduct a traffic stop. First, it is undisputed that Plaintiff backed his truck into another vehicle and left the scene of the accident. It is also undisputed that this hit-and-run accident was reported to Defendants Thompson and Archibeque, and that they followed Plaintiff's truck for a considerable distance with their emergency equipment engaged before Plaintiff finally brought his truck to a stop on New York Avenue. According to the undisputed deposition testimony of Defendants Thompson and Archibeque, which is attached to Plaintiff's response brief, they observed Plaintiff engage in erratic driving behavior, such as drifting into the adjacent lane and overcorrecting on a turn, during their pursuit. (Archibeque Dep. at 7-9; Thompson Dep. at 9-17.) These undisputed facts provide the reasonable suspicion necessary to conduct a traffic stop. See United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (stating requirements for traffic stops based on reasonable suspicion); United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (same). Plaintiff does not contest the conclusion that the initial traffic stop was supported by reasonable suspicion. (Pl.'s Mem. at 8.)

The Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see Holt, 264 F.3d at 1220-26, 1228-30. Further, an "officer may detain the driver for questioning unrelated to

-15-

the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring." Hunnicutt, 135 F.3d at 1349.

An investigative detention based on reasonable suspicion does not necessarily preclude the use of certain security measures when there are objective, reasonable concerns about officer safety. See, e.g., Holt, 264 F.3d at 1223 (concluding that in light of an officer's "objective, reasonable basis to fear for his or her life every time a motorist is stopped," officers conducting routine traffic stops may order the driver and passengers to get out of the vehicle and to raise their hands during the stop); United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground) Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an investigatory stop by grabbing a suspect by the arm and placing him face down on the pavement). In this case Defendants had an objective reason to be concerned about their safety based on their observations of Plaintiff's erratic and evasive behavior prior to the stop and the fact that they were conducting the stop on an open public street during the evening. See Gallegos, 114 F.3d at 1030-31. Thus, the fact that Defendants may have drawn a weapon or made physical contact with Plaintiff does not necessarily mean that the investigative detention ripened into a full custodial arrest at that moment.

Even if the Court accepts as true Plaintiff's assertions that he did not resist the officers after exiting his vehicle, the undisputed facts concerning what the officers observed at that time serve to corroborate their suspicions and establish probable cause for further detention. In particular, the parties have presented undisputed evidence that the individual Defendants observed additional signs that Defendant was intoxicated after he exited the truck but before he was taken to the hospital for medical treatment.  (Apodaca Aff. ¶ 12; Thompson Aff. ¶¶ 36-37; Ex. C. to Pl.'s Mem.)  This evidence supports the further detention of Plaintiff while he was awaiting and receiving medical treatment and a blood test.

The blood test at the hospital confirmed that Defendant was intoxicated. Additionally, the officers' further observation of the vehicle with which Plaintiff's truck had collided, as well as Defendant Archibeque's interviews of its occupants, corroborated their suspicion that Plaintiff had been involved in a hit-and-run accident.

The undisputed facts and observations recited above combine to form probable cause to support an arrest for driving while intoxicated, reckless driving, and "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop . . . by a uniformed officer in an appropriately marked police vehicle."  N.M. Stat. Ann. § 30-22-1(C) (Michie 1978 & Supp. 1994) (evading an officer); id. § 66-8-102 (Supp. 2003) (driving while intoxicated); id. § 66-8-113 (Supp. 1998) (reckless driving); see Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003) (concluding that stop, citation, and arrest for violation of N.M. Stat. Ann. § 30-22-1(C) was supported by probable cause); Latta v. Keryte, 118 F.3d 693, 700-01 (10th Cir. 1997) (concluding that seizure for violation of N.M.

Stat. Ann. §§ 30-22-1, 66-8-102, and 66-8-113 was supported by probable cause); State v. Jones, 1998-NMCA-076, ¶¶ 8-10, 125 N.M. 556, 964 P.2d 117 (concluding that seizure for violation of N.M. Stat. Ann. § 66-8-102 was supported by probable cause). Driving while intoxicated, reckless driving, and evading an officer in this manner are criminal offenses for which municipal police officers are authorized to arrest a suspect under New Mexico law. See N.M. Stat. Ann. §§ 66-8-122, 66-8-123 (Michie 1978 & Supp. 1998) (stating exceptions to the general rule requiring release from custody for violations of the motor-vehicle code after a traffic citation is issued when the person is charged with reckless driving or driving while intoxicated); Gross, 245 F.3d at 1154; Jones, 1998-NMCA-076, ¶¶ 8-10. While Plaintiff may dispute the factual basis for other charges that arose from the altercation that ensued after he exited his truck, he has not presented evidence to create a genuine dispute over the factual basis that establishes probable cause for the charges of driving while intoxicated, reckless driving, and evading an officer while driving his vehicle.

The fact that some of the criminal charges were later dismissed as part of a plea bargain does not necessarily imply that probable cause for an arrest was lacking. The probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49). Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe '*an* offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United

-18-

States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).  There is an undisputed factual basis for concluding that Defendants have met this requirement in this case.

Plaintiff has not come forward with any law showing a clearly established right not be arrested for these offenses under these circumstances.  On the contrary, the law of the Tenth Circuit applying the constitutional requirement of probable cause to the New Mexico statutes in question tends to support Defendants' view that their arrest of Plaintiff for violation of these statutes was objectively reasonable.  See Latta, 118 F.3d at 700-01; Marshall, 345 F.3d at 1166.  Accordingly, the individual Defendants are entitled to qualified immunity with respect to Plaintiff's claim that they violated his Fourth Amendment rights by arresting him without probable cause.  Their motion for summary judgment is granted in part with respect to this claim.

**b.     Excessive Force During Arrest**

The Court next turns to Plaintiff's claim that the force used in effecting the arrest was excessive and unreasonable.  The standard of objective reasonableness described above also governs the degree of force which lawfully may be used to effectuate an arrest.  Factors which are relevant to the reasonableness of the force used to effect an arrest "include the crime's severity, the potential threat posed by the suspect to the officer and others' safety, and the suspect's attempts to resist or evade arrest."  Saucier, 533 U.S. at 207.  But it is not relevant that Plaintiff later pled guilty to a charge of careless driving or might have been guilty of other criminal offenses because the constitutional prohibition on the use of excessive force "serves as a protection to the innocent as well as to the guilty."  Ullmann v.

-19-

United States, 350 U.S. 422, 427 (1956); see Kopf v. Skyrm, 993 F.2d 374, 379 (4th Cir. 1993) (concluding that so long as "probable cause is present, the actual guilt or innocence of the arrestee is irrelevant to the amount of force that may be used"); cf. Graham, 490 U.S. at 396 (noting that the reasonableness of a particular use of force is not to be judged "with the 20/20 vision of hindsight").

In support of their motion for summary judgment on this issue, Defendants correctly cite the proposition that the Fourth Amendment permits officers to use some degree of physical coercion or threat thereof to effectuate an arrest.  See Saucier, 533 U.S. at 208; Graham, 490 U.S. at 396; Gross, 245 F.3d at 1158.  Further, as noted above, it is not necessarily unreasonable for officers to make a limited show of force, which may involve some degree of physical contact with a suspect, in the process of an investigative detention based on reasonable suspicion when, as here, objectively reasonable concerns about officer safety are present.  See Holt, 264 F.3d at 1223; Perdue, 8 F.3d at 1463; Gallegos, 114 F.3d at 1030-31.

But in this case the facts are sharply disputed as to the degree of force used, and the reasons for that use of force, after Plaintiff exited his vehicle and Defendant Archibeque made physical contact with him.  Plaintiff contends that he offered no resistance which could justify the escalation of force applied in this case, particularly the need for three officers to tackle and hold him down on the ground, spray mace at his face, exert enough pressure on his right arm to break it, and place him in handcuffs after he ceased any alleged resistance and was screaming in pain.  While the Court notes that Plaintiff's version of events does not

appear to be corroborated by the deposition testimony, affidavits, or police reports of any of the Defendants or other witnesses at the scene, in this case his affidavit alone is sufficient to establish a genuine issue of material fact that precludes summary judgment on this claim. Given the conflicting affidavits and the absence of a videotape or other recording of the incident, the determination of the credibility of Plaintiff's testimony must be left to the factfinder at trial in this instance. See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1314-15 (10th Cir. 2002).

If the jury chooses to believe Plaintiff's version of events, then the use of force in this case may come close to the form of obvious cruelty for which no case law directly on point is needed to defeat the defense of qualified immunity. See Hope, 536 U.S. at 741, 745; Holland, 268 F.3d at 1197. In this regard, the Court notes the Tenth Circuit's recent opinion in Olsen, 312 F.3d at 1315, wherein summary judgment on an excessive-force claim was precluded by disputed evidence that an officer "cocked [a suspect's] arm at an angle . . .clear up the middle of his back" even though he "complied physically at all times" with the officer during the arrest. See also Butler v. Norman, 992 F.2d 1053, 1055 (10th Cir. 1993) (concluding that summary judgment was not warranted where parties' factual assertions regarding an excessive force claim were "sharply contested"). Further, "Tenth Circuit precedent clearly established before June 18, 1992, that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996) (collecting cases). For these reasons, none of the individual Defendants are entitled to qualified

immunity with respect to Plaintiff's claim that they used excessive force to arrest him, or failed to intervene and prevent such excess, after he exited his vehicle on New York Street. The individual Defendants' motion for summary judgment is denied in part with respect to this claim.[1]

### 2.   Municipal Liability and Supervisory Liability

Defendants also have moved for summary judgment with respect to any claims for municipal liability or supervisory liability that Plaintiff's *Complaint* may assert against them under 42 U.S.C. § 1983.  Under the previous analysis of Plaintiff's federal civil-rights claims against the individual Defendants, there are no underlying constitutional violations which could provide a basis for municipal liability or supervisory liability except for Plaintiff's claims that the individual Defendants used excessive force to arrest him after he exited his vehicle on New York Street.  Accordingly, the Court's analysis of municipal liability and supervisory liability is limited to Plaintiff's excessive-force claim.  See Olsen, 312 F.3d at 1317.

_____

[1]The Court will not further address the arguments advanced by Defendants Apodaca and the City of Albuquerque which are entirely premised on the assertion that there was no constitutional violation on which to base a finding of supervisory liability or municipal liability because Defendants Archibeque and Thompson did not use excessive force.  Those arguments are foreclosed by the above analysis of the individual Defendants' summary-judgment motion.  The parties' other arguments regarding the municipal liability of Defendant City of Albuquerque and the supervisory liability of Defendant Apodaca will be addressed separately below.

### a.  Supervisory Liability

The Court first addresses the relatively straightforward issue of the supervisory liability of Defendant Apodaca.  To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.  See Holland, 268 F.3d at 1187.  In particular, a plaintiff must show that the supervisor actively participated or acquiesced in the constitutional violation through personal participation, an exercise of control or direction, or a failure to supervise.  See id.  While Defendant Apodaca did not arrive at the scene and join the altercation until Plaintiff was already on the ground, he actively and personally participated in the events relating to Plaintiff's excessive-force claim which transpired after that time.  It is also undisputed that he was the area supervisor of Defendants Thompson and Archibeque.  Accordingly, Defendants' motion for summary judgment must be denied in part with respect to the issue of Defendant Apodaca's supervisory liability for the use of excessive force after his arrival on the scene.

### b.  Municipal Liability

The Court next addresses the more complex issue of municipal liability.  A municipality "may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees."  Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998).  In order to prevail on a claim of municipal liability, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the

deprivation of federal rights." Id. "[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." Id.

In the absence of such an explicit policy, proving culpability and causation are more difficult, as plaintiffs are required to show "'deliberate indifference to the rights of persons with whom the police come into contact.'" Olsen, 312 F.3d at 1318 (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Such deliberate indifference may be shown "'when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" Id. (quoting Barney, 143 F.3d at 1307).

In this case, the only theory of municipal liability presented in Plaintiff's response to Defendants' motion on this issue relies on allegations of past misconduct by Defendant Apodaca. According to Plaintiff, there is evidence in Defendant Apodaca's sealed internal-affairs file which shows that he has been reprimanded in the past with regard to other excessive-force claims.[2] Plaintiff also points out that Defendant Apodaca has been named as a defendant in other civil actions alleging excessive force on at least four occasions. Plaintiff claims that the record of Defendant Apodaca's alleged misconduct in the past has

---

[2]In support of this contention, Plaintiff's counsel attached an affidavit to his response to Defendants' motion for summary judgment in which he referred to the existence of an internal affairs file that was subject to a protective order. [Ex. A to Pl.'s Mem.] Defendants stated in their reply brief that they would not object to filing such materials under seal, and the sealed exhibits were filed on January 15, 2004, in response to an *Order* from the Court. [Doc. No. 44, 45.]

placed the City on notice of his violent propensities which, according to Plaintiff, establish with substantial certainty that he will be the source of future constitutional violations and that he does not belong in a supervisory position.

The Court concludes that Plaintiff has not come forward with evidence which could support a claim of municipal liability in this case. The four other civil actions cited by Plaintiff do not support a reasonable inference that Defendant Apodaca has engaged in any pattern of past misconduct that could be causally linked to this case. Three of those actions were dismissed by stipulation of the parties before trial. See Luchini-Sheridan v. Jeffries, CIV No. 91-00299 JB/WWD (D.N.M. Mar. 12, 1992); Mares v. Apodaca, CIV No. 91-00709 JC/JHG (D.N.M. Oct. 9, 1992); Chao v. Burge, CIV No. 94-01353 EM/RJD (D.N.M. May 17, 1996). The fourth action involves an incident that occurred more than a year after the events at issue in this case, and that action is still pending with no finding of liability as to any Defendant. See Bain v. City of Albuquerque, CIV No. 03-00036 WJ/KBM (D.N.M. filed Jan. 9, 2003). In the absence of evidence creating a material issue as to whether liability was established in other lawsuits concerning earlier incidents, the fact that such other lawsuits were filed against Defendant Apodaca or other officers does not support a reasonable inference that the City improperly failed to discipline, train, or otherwise control its officers in a way that could be causally linked to the events at issue in this case. See Jojola v. Chavez, 55 F.3d 488, 491 (10th Cir. 1995); Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999).

The Court concludes that Plaintiff's assertions regarding the contents of Defendant Apodaca's sealed internal affairs file also do not provide a basis for municipal liability in this case.   The Court has reviewed the sealed exhibits filed in support of these assertions, and they do not support Plaintiff's contention that the City was deliberately indifferent to the information it received about Defendant Apodaca.   Rather, they show that the City did not condone the use of excessive force, but instead took disciplinary action in response to it.   The fact that the City chose an alternative other than terminating Defendant Apodaca's employment or relieving him of his supervisory duties does not give rise to a reasonable inference that the City was deliberately indifferent to police misconduct.   A city cannot be held liable under the theory of municipal liability articulated in <u>Monell</u> for failure to discipline in a specific instance in a specific fashion.   <u>See</u> <u>Santiago v. Fenton</u>, 891 F.2d 373, 382 (1st Cir. 1989) (citing <u>Kibbe v. City of Springfield</u>, 777 F.2d 801, 809 n. 7 (1st Cir. 1985)).

Further, the relationship between Defendant Apodaca's conduct in this case and any allegations of prior misconduct is too attenuated to establish a causal connection between a municipal policy or custom and the injury alleged here.   In this regard, the Court notes that the instances in which Defendant Apodaca allegedly was reprimanded for using excessive force occurred between 1989 and 1991, approximately nine years before the incident which is the subject of Plaintiff's *Complaint*.

Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known consequence of his action.   <u>See</u> <u>Bd. of County</u>

Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997).  This Court concludes that Plaintiff's evidence does not give rise to a reasonable inference of deliberate indifference on the part of the City in establishing policies or customs which bear on the constitutional violation alleged here.  See Ware v. Unified Sch. Dist. No. 492, 902 F.2d 815, 819 (10th Cir. 1990).  Accordingly, Defendant City of Albuquerque is entitled to summary judgment on this issue.

### C.   Plaintiff's Tort Claims Under State Law

The liability of Defendant City of Albuquerque and its employees for statutory or common-law torts is limited by the New Mexico Tort Claims Act (NMTCA), N.M. Stat. Ann. §§ 41-4-1 to 41-4-29 (Michie 1978 & Supp. 2001).  Section 41-4-4(A) of the NMTCA grants governmental immunity from liability for any tort to governmental entities and public employees acting within the scope of their duties except as waived by Sections 41-4-5 to 41-4-12 of the NMTCA.  The waiver of immunity applicable to "law enforcement officers while acting within the scope of their duties" contained in Section 41-4-12 is limited to

> liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico.

Assault and battery are among the torts enumerated in Section 41-4-12, and thus the NMTCA does not preclude Plaintiff from proceeding on these claims.

While the NMTCA does not waive sovereign immunity for simple negligence of law enforcement officers, see Caillouette v. Hercules, Inc., 113 N.M. 492, 497, 827 P.2d 1306,

1311 (Ct. App. 1992), if one or more of the torts or civil-rights violations enumerated in Section 41-4-12 of the NMTCA were caused by the negligence of other law enforcement officers acting within the scope of their duties, immunity is waived for such negligence.  See Methola v. County of Eddy, 95 N.M. 329, 333, 622 P.2d 234, 237 (1980); McDermitt v. Corrections Corp. of Am., 112 N.M. 247, 249, 814 P.2d 115, 117 (Ct. App. 1991).  Thus, the NMTCA does not necessarily preclude a claim for negligent supervision and training by Defendants Apodaca or the City of Albuquerque where that negligence results in an assault, battery, or Fourth Amendment violation by one or more subordinate officers.

In this case, the individual Defendants contend that Plaintiff's state-law claims of assault and battery are subject to dismissal because they had legal justification for their conduct and good faith defenses based on undisputed facts.  Defendants Apodaca and the City of Albuquerque also contend that they are not liable for negligent supervision and training of subordinate officers involved in the altercation with Plaintiff.  Plaintiff disputes these contentions, which are separately analyzed below.

### 1.    Assault and Battery

New Mexico does not have uniform civil jury instructions for the torts of assault or battery.  See NMUJI 13-1624 cmt. (Michie 2003) (noting committee's conclusion that "there was insufficient New Mexico law on assault and battery to guide the committee on this subject").  Thus, the Court relies on published opinions of the State's appellate courts, analogous statutory offenses, and relevant provisions of the Restatement (Second) of Torts to define the elements of these torts and any relevant defenses.

Under Sections 13 and 18 of the Restatement, an actor is subject to liability to another for battery if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful or offensive contact with the person of the other directly or indirectly results.  See Restatement (Second) of Torts §§ 13, 18 (1965).  New Mexico's criminal statutes further define battery as "the unlawful, intentional touching or application of force to the person of another," N.M.Stat. Ann. § 30-3-4 (Michie 1978).

Under Section 21 of the Restatement,

An actor is subject to liability to another for assault if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts, supra, § 21.  New Mexico law further provides that "[a]n assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'"  Romero v. Sanchez, 119 N.M. 690, 693, 895 P.2d 212, 215 (1995) (quoting N.M. Stat. Ann. 30-3-1(B) (Michie 1994)); see also  Baca v. Velez, 114 N.M. 13, 15, 833 P.2d 1194, 1196 (Ct. App. 1992).

A common element of assault and battery is an intent "'to engage in unlawful conduct that invades the protected interests of others.'"  Caillouette, 113 N.M. at 496-97, 827 P.2d at 1310-11 (quoting California First Bank v. State of N.M., 111 N.M. 64, 74 n.6, 801 P.2d 646, 656 n.6 (1990)).  Thus, where a police officer's actions in detaining or arresting a

suspect are not unlawful, the officer is not subject to liability for the torts of assault or battery.  See Restatement (Second) of Torts, supra, § 121.  Further, if the means employed by the officer to effect an otherwise lawful arrest are in excess of those which he is privileged to use, the officer is liable only for so much of the force as is excessive.  See id. § 133.

"Fear of arrest is not equivalent to fear of an imminent battery."  See Romero, 119 N.M. at 693, 895 P.2d at 215.  As noted in the above analysis of Plaintiff's federal civil-rights claims, it is undisputed that the Defendants made a show of force when they first confronted Plaintiff as he exited his vehicle.  While this show of force may have amounted to a threat or menacing conduct which caused Plaintiff to reasonably believe that he was in danger of receiving an immediate battery, it follows from the above analysis of Plaintiff's federal civil-rights claims that Defendants had legal justification for this threatening or menacing conduct which preceded their physical altercation with Plaintiff.  Thus, Defendants are entitled to summary judgment with respect to Plaintiff's assault claim.

The Court reaches a difference conclusion with respect to the tort of battery.  The above analysis of Plaintiff's federal civil-rights claims shows that there are genuine issues of material fact as to the individual Defendants' legal justification for the degree of force that they actually applied to Plaintiff after he exited his vehicle.  It follows from this analysis that Defendants are not entitled to summary judgment on Plaintiff's battery claim.

## 2.   Negligent supervision and training

As noted above, the NMTCA "waives immunity for negligent training and supervision by a law enforcement officer that causes the commission by a subordinate law enforcement officer of a tort listed in Section 41-4-12." McDermitt, 112 N.M. at 249, 814 P.2d at 117; Ortiz v. N.M. State Police, 112 N.M. 249, 252, 814 P.2d 117, 120 (Ct. App. 1991).  The torts listed in Section 41-4-12 include battery and the deprivation of constitutional rights.  Thus, insofar as Plaintiff has viable claims against the individual Defendants for the tort of battery and the use of excessive force in violation of the Fourth Amendment, New Mexico law also permits him to assert tort claims against the individual Defendants' supervisors for negligent acts that are causally related to the alleged battery and use of excessive force.

In order to survive a motion for summary judgment on this issue, however, Plaintiff must come forward with evidence establishing the negligence of the individual Defendants' supervisors and the causal link between this negligence and the battery or excessive force. See generally Narney v. Daniels, 115 N.M. 41, 51, 846 P.2d 347, 357 (Ct. App. 1993); Los Ranchitos v. Tierra Grande, Inc., 116 N.M. 222, 228, 861 P.2d 263, 269 (Ct. App. 1993); Medina v. Graham's Cowboys, Inc., 113 N.M. 471, 473, 827 P.2d 859, 861 (Ct. App. 1991). The only evidence presented by Plaintiff in support of this issue concerns Defendant Apodaca's presence at the scene of the incident and the City's knowledge of the contents of his internal-affairs file and other civil actions in which he was alleged to have used excessive force.  When viewed in the light most favorable to Plaintiff, this evidence could support a reasonable inference that Defendant Apodaca was negligent in his supervision of Defendants

Thompson and Archibeque after he arrived at the scene.  Thus, Defendants' motion for summary judgment must be denied in part with respect to Plaintiff's negligent supervision claim against Defendant Apodaca insofar as it arises from his presence at the scene of the incident.

There is no evidence, however, to support a causal link between any alleged past misconduct of Defendant Apodaca (or any other supervisory official) and the present action. As noted in the above analysis of Plaintiff's federal civil-rights claims, the allegations of Defendant Apodaca's past misconduct relating to excessive force are too remote and attenuated to support such a causal connection.  Further, Plaintiff has not presented evidence of any deficiency in the training or instructions regarding the use of force that any of the individual Defendants received from the City or its supervisory officials prior to the incident. In the absence of such evidence, Defendants Apodaca and the City of Albuquerque are entitled to summary judgment with respect to any claim for negligent training, as well as any claim for acts of negligent supervision that preceded Defendant Apodaca's arrival on the scene of the incident.  See Adler, 144 F.3d at 671-72 (explaining non-movant's burden of production in response to motion for summary judgment).

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment with respect Plaintiff's federal civil-rights claim that he was arrested without probable cause as well as Plaintiff's federal civil-rights claim for municipal liability

and his tort claims under state law for assault, negligent training, and acts of negligent supervision that preceded Defendant Apodaca's arrival at the scene of the incident.

The Court further concludes that there are genuine issues of material fact which preclude summary judgment on Plaintiff's federal civil-rights claim that the individual Defendants used excessive force as well as his federal civil-rights claim for supervisory liability against Defendant Apodaca and his tort claims under state law for battery and Defendant Apodaca's negligent supervision of the other individual Defendants after his arrival at the scene.

**IT IS, THEREFORE, ORDERED** that the *City Defendant's Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint Against It* [Doc. No. 30] is **GRANTED IN PART** and **DENIED IN PART** as specified above.

**IT IS FURTHER ORDERED** that *Defendants Thompson, Archibeque, and Apodaca's Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint* [Doc. No. 32] is **GRANTED IN PART** and **DENIED IN PART** as specified above.

**SO ORDERED**, this 28th day of January 2004, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
*United States District Judge*

-33-